IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CINDY EDWARDS,

     Plaintiff,

v.

WELLSTAR MEDICAL GROUP,
LLC,

     Defendant.

CIVIL ACTION FILE NO.
1:18-CV-4492-MHC-LTW

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION

Plaintiff Cindy Edwards filed the above-styled action against Defendant WellStar Medical Group, LLC on September 25, 2018. [Doc. 1]. Plaintiff filed an Amended Complaint on February 13, 2019. [Doc. 14]. Plaintiff's claims are based on the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* [Id.]. Specifically, in Counts One and Two, Plaintiff asserts FMLA claims for retaliation and interference. [Id., ¶¶ 37-50]. Plaintiff asserts in Count Three that Defendant violated the ADA when the company "regarded her as disabled." [Id., ¶¶ 51-57]. In Counts Four and Five, Plaintiff asserts ADA claims for actual discrimination, failure to accommodate, and retaliation. [Id. ¶¶ 58-75]. This case is presently before the Court

on a Motion for Summary Judgment [Doc. 31] filed by Defendant pursuant to Federal Rule of Civil Procedure 56.

For the reasons discussed below, the Court **RECOMMENDS** that Defendant WellStar's Motion for Summary Judgment [Doc. 31] be **GRANTED** and that Plaintiff Edwards' claims [Doc. 14] be **DISMISSED WITH PREJUDICE**.

## I.     FACTS

Defendant WellStar Medical Group, LLC ("WellStar") is a provider of health care services with medical offices located throughout Georgia.  [Defendant's Statement of Material Facts ("DSMF") ¶ 1].    Defendant maintains policies prohibiting discrimination on any legally protected basis, including an individual's disability. [DSMF ¶ 2].  Defendant's policies also prohibit retaliation against an individual who submits a complaint alleging a violation of the company's equal employment policies. [DSMF ¶ 3].

Plaintiff Cindy Edwards became employed by Defendant WellStar in October 2013 as an Office Supervisor at the Austell Pediatric and Adolescent Center.  [DSMF ¶ 4].  Plaintiff later applied for an Office Manager position at the Powder Springs Medical Center.  [DSMF ¶ 5].  The Powder Springs Medical Center is a family medical practice with three physicians, two nurse practitioners, and approximately ten to fifteen total employees.  [DSMF ¶ 9; Plaintiff's Deposition ("Pla. Dep.") at 37-38].  Tracey

Hazelwood was selected for the position over Plaintiff, but several months later, around March 2016, Hazelwood resigned. [DSMF ¶ 6]. Plaintiff was promoted to Office Manager at the Powder Springs Medical Center in March 2016. [Plaintiff's Statement of Material Facts ("PSMF") ¶ 1]. Plaintiff was offered the job by Ty Rinoski, who was the Director of Patient Operations. [DSMF ¶ 7]. The Director of Patient Operations over the Powder Springs Medical Center reports to Assistant Vice President ("VP") Amber Thomas-Hutson. [DSMF ¶¶ 15, 16; PSMF ¶ 15]. Director Rinoski was Plaintiff's supervisor from March 2016 until March 31, 2017. [PSMF ¶ 8].

In the Office Manager position, Plaintiff Edwards reported to the Director of Patient Operations and had hiring and firing authority over all personnel at the Powder Springs Medical Center except the physicians. [DSMF ¶¶ 8, 10]. Plaintiff's general duties as Office Manager included: overseeing the day-to-day operation; rounding up physicians and staff members; rounding on patients; ordering supplies; managing supplies; and providing instructions for the day. [PSMF ¶ 2; DSMF ¶ 11]. Plaintiff's essential duties included: coordination of operations of the practice and staff meetings; supervision of patient scheduling, billing, and medical records; monthly financial reports; and managing staff performance. [PSMF ¶ 5].

In October 2016, Assistant Vice President of Human Resources ("Assistant HR VP") Joey Hunt discussed with Director Rinoski the possibility of issuing Plaintiff a

"coaching session," not a formal counseling, due to Plaintiff having an alleged difficulty building relationships with employees and due to her communications and actions. [DSMF ¶ 12; PSMF ¶ 6; Hunt Declaration ("Dec.") ¶ 3, Ex. 1]. Rinoski decided against issuing a counseling because he thought he might lose Plaintiff and he could not afford to lose another manager. [DSMF ¶ 13; Hunt Dec. ¶ 3, Ex. 1].

Plaintiff's mid-year evaluation, which was completed in March 2017, was positive overall. [PSMF ¶ 10]. Director of Patient Operations Rinoski resigned his employment effective March 31, 2017. [DSMF ¶ 14]. In April 2017, Janice Anderson became the interim Director of Patient Operations and Plaintiff's supervisor. [DSMF ¶ 17; PSMF ¶ 9]. Plaintiff testified that Anderson "mentioned . . . that she was not happy with the way [Plaintiff] was handling a staff member's HR, staff member's writeup basically." [Pla. Dep. at 53].

Plaintiff's grandfather passed away in May 2017. Plaintiff applied for and was granted FMLA leave due to bereavement and workplace stress beginning on May 16, 2017, and she remained on leave until August 21, 2017. [PSMF ¶ 17; DSMF ¶ 21]. Anderson was Plaintiff's Director of Patient Operations when Plaintiff took FMLA in May 2017. [PSMF ¶ 12]. Plaintiff's serious health condition was stress and anxiety and resulted in the following: inability to sleep; panic attacks; inability to cope with stress and anxiety; negative impact on her quality of life; and overall constant state of

4

worry about the practice.  [PSMF ¶ 17].

Plaintiff testified that Janice Anderson left the interim Director of Patient Operations position in August 2017 while Plaintiff was on FMLA leave.  [Pla. Dep. at 43-44].  When Plaintiff returned from leave on August 21, 2017, no one was in the Director of Patient Operations position.  [DSMF ¶ 23].  Assistant VP Amber Thomas-Hutson was again serving as the interim Director of Patient Operations while that position was vacant.  [DSMF ¶ 25].  The next month, September 2017, Thomas-Hutson introduced Plaintiff to Adewale Adebayo, the new Director of Patient Operations.  [PSMF ¶ 20; DSMF ¶ 26].  During the initial meeting with Adebayo on September 6 or 7, 2017, Thomas-Hutson accused Plaintiff of poor performance allegedly based on comments from Janice Anderson.  [PSMF ¶ 21].

Each year, Defendant WellStar surveys its employees to measure their satisfaction with their workplace environment as part of its effort to be a "Great Place to Work."  [DSMF ¶ 27; PSMF ¶ 22].  The surveys were completed while Plaintiff was on FMLA leave from May 2017 to August 21, 2017.  [PSMF ¶ 23].  Results from the survey became available around August 2017 and reflected significant concerns about the work environment at the Powder Springs Medical Center.  [DSMF ¶ 28].  Plaintiff received the results shortly after she returned from FMLA leave.  [PSMF ¶ 24].

Due to the low scores on the surveys, a "trust focus group" meeting was

scheduled on September 13, 2017, for Assistant VP Thomas-Hutson, Director of Patient Operations Adebayo, and Senior HR Director Meili Villalba to meet with employees at the Powder Springs Medical Center to try to determine why the scores were so low and what could be done to address the situation.[1]  [DSMF ¶ 30].  Thomas-Hutson would not allow Plaintiff to attend allegedly in order to give the staff a comfortable atmosphere to express their concerns freely.  [PSMF ¶ 25; DSMF ¶ 31].  Thomas-Hutson, in fact, forced Plaintiff to leave the facility during the meeting.  [PSMF ¶ 26].

Plaintiff Edwards testified that when she returned to the facility after the focus group meeting, she did not ask employees what was said during the meeting, and she told Assistant VP Thomas-Hutson the same.  [PSMF ¶ 29; Pla. Dep. at 64-65].  However, employee Dana Williams sent an email to Thomas-Hutson stating that an employee named Toni Clarke told Plaintiff about the meeting.  [Thomas-Hutson Dec. ¶ 4, Ex. 1].  During a telephone call on September 14, 2017, Thomas-Hutson accused Plaintiff of asking the staff about the meeting.  Thomas-Hutson also told Plaintiff that the staff was feeling anxious and fearful because the information from the meeting had been told to Plaintiff.  [PSMF ¶ 30].  Thomas-Hutson placed Plaintiff on administrative

---

[1] Plaintiff testified that in her experience, the survey results typically were shared with Office Managers at each location, and the Office Managers were then required to set goals for the practice, the staff, and themselves.  [PSMF ¶ 28; Pla. Dep. at 63-64].

leave on September 14, 2017, allegedly in order to investigate the allegations surrounding the trust focus group meeting and whether Plaintiff had discussed the meeting with staff.  [PSMF ¶ 33; DSMF ¶ 33].

Plaintiff called WellStar's HR Department and filed a formal complaint with the compliance hotline against Thomas-Hutson.  [PSMF ¶ 32; Pla. Dep. at 66, 68]. Assistant HR VP Joey Hunt investigated Plaintiff's complaints about Thomas-Hutson's behavior.  [PSMF ¶ 40].  Thomas-Hutson was not placed on paid administrative leave during this investigation.  [Id.].  Hunt asked Plaintiff to come in while on administrative leave to give a verbal statement about the investigation of her complaint against Thomas-Hutson.  [PSMF ¶ 42].

On September 19, 2017, five days after Plaintiff had been placed on administrative leave, Thomas-Hutson wrote an email to Hunt and recommended that Plaintiff be terminated.  [PSMF ¶ 35; Hunt Dep., Exs. 18, 22].  Thomas-Hutson had interviewed a number of employees at the Powder Springs Medical Center.  [DSMF ¶ 34].  One employee named Bernadette Hensen reported that she was on "pins and needles" when Plaintiff is in the office because she is "cold" and although "she says she cares about the staff, [] her face and body language do not say that at all."  [Thomas-Hutson Dec. ¶ 6, Ex. 2].  Other employees made similar statements to Thomas-Hutson about Plaintiff.  [Id.].  Plaintiff remained on paid administrative leave from September

14 to October 14, 2017.  [PSMF ¶ 34].

While Plaintiff was on administrative leave, Assistant HR VP Hunt contacted Plaintiff and asked her to provide a statement concerning the allegations that she confronted employees seeking information about what was said during the trust survey meeting.  [DSMF ¶ 40; Pla. Dep. at 70].  Although Assistant VP Amber Thomas-Hutson had recommended that Plaintiff's employment be terminated, the WellStar HR Department did not approve the termination because Plaintiff had not previously received any discipline.  Instead, in October 2017, Plaintiff was given the option of receiving a Performance Improvement Plan or taking a three-month severance package. [DSMF ¶¶ 41-43; PSMF ¶ 44; Pla. Dep. at 73-75; Hunt Dep. at 104].  Plaintiff did not select either of these options, so Hunt told her that he assumed she would be returning to her role as the Office Manager at the Powder Springs Medical Center and that she would be placed on the Performance Improvement Plan.  [DSMF ¶ 44; PSMF ¶ 52; Pla. Dep. at 84].

The Performance Improvement Plan ("PIP"), which was dated October 6, 2017, noted that it was created to address "ongoing issues discussed with [Plaintiff] in FY17 and FY18." [DSMF ¶ 45; Hunt Dec., Ex. 4].  The PIP stated that Plaintiff had exhibited a "lack of professional behavior" which had negatively impacted "team member engagement and team member perception of a safe, non-hostile work environment."

[Id.].  The PIP also stated that Plaintiff had engaged "in discussion about Trust Action Planning Focus sessions where names and comments of specific team members were revealed to manager leading to mass anxiety and fear of retaliation by manager toward team members."  [Id.].  In addition, the PIP stated that Plaintiff had deficiencies in communication, working relationships, working collaboratively with physicians, and her ability to receive constructive feedback, all of which allegedly violated WellStar's Code of Conduct.  [Id.].  The PIP included the expectation that Plaintiff would "participate in meaningful rounding with her lead physician each day" and "organize 1-2 daily meaningful, positive in-person huddles with her team to promote team cohesiveness, patient experience, and team member engagement."  [Id.].  Hunt told Plaintiff that he would have Assistant VP Amber Thomas-Hutson clarify the PIP.  [PSMF ¶ 45].  However, shortly thereafter, Hunt said that the PIP was issued "as is" and that Plaintiff could have an attorney review a severance agreement.  [PSMF ¶ 46].

Plaintiff testified that she emailed a rebuttal of the October 2017 PIP to Thomas-Hutson and HR and alleged that the deficiencies outlined in the PIP had not been discussed with Plaintiff beforehand.  [PSMF ¶ 47; Pla. Dep. at 81].  Some of the information contained in the PIP came from staff members that Plaintiff had previously disciplined about their own work deficiencies.  [PSMF ¶ 49].  Prior to taking FMLA leave from May 2017 to August 2017, Plaintiff had never received any write ups or

discipline.  [PSMF ¶ 50].  Plaintiff's therapist, Licensed Clinical Social Worker ("LCSW") Robert Bryant, headed outpatient group therapy sessions with Plaintiff at Kaiser Permanente.  [PSMF ¶ 163].  Bryant testified that he had concerns with the PIP created in October 2017 for Plaintiff because of how some aspects of it would be difficult to overcome for someone suffering from major depressive disorder and anxiety, including: (1) arriving to work daily with a positive attitude; (2) requiring Plaintiff to "smile"; (3) requiring Plaintiff to come to work every day; and (4) always having to project a "positive attitude."  [PSMF ¶ 53].  Plaintiff's physician recommended that she go back on FMLA leave to resume treatment in October 2017, which was approved.  [PSMF ¶ 54].

As noted *supra*, Plaintiff was on FMLA leave from May 2017 to August 21, 2017, and she was on paid administrative leave from September 14 to October 14, 2017.  [PSMF ¶¶ 23, 34].  Plaintiff went back on FMLA leave on Monday, October 16, 2017, and remained on FMLA leave until February 23, 2018.  [DSMF ¶¶ 47, 50; PSMF ¶¶ 55, 56; Hunt Dep. at 114; Pla. Dep. at 84-85].  When Plaintiff returned from her FMLA leave on February 23, 2018, Assistant HR VP Joey Hunt met with Plaintiff to discuss her rebuttal to the PIP and her severance option.  [PSMF ¶ 63].  Plaintiff also requested intermittent FMLA leave from February 22, 2018 to February 23, 2019, which was approved on April 11, 2018.  [PSMF ¶ 67].  In addition, Plaintiff asked for

a reduced schedule of four hours per day based on a recommendation by her doctor. [PSMF ¶ 60; DSMF ¶ 51; Pla. Dep. at 90, 94]. The reduced schedule was to be for thirty days. [PSMF ¶ 61; Pla. Dep. at 94]. The reduced hours were 8am to 12pm three days a week and 1pm to 5pm two days a week for inpatient treatment. [PSMF ¶ 62]. Plaintiff's requested accommodation was approved and she returned to work. [DSMF ¶ 52; Pla. Dep. at 91].

On March 1, 2018, approximately a week after Plaintiff Edwards returned to work from her four-month FMLA leave, Plaintiff submitted a complaint about Director of Patient Operations Adewale Adebayo. [DSMF ¶ 55]. Plaintiff complained about Adebayo questioning her in the office hallway about her need for FMLA, what days was she going to be off of work because of FMLA, and what illness she had in order to need FMLA. [PSMF ¶ 75; Pla. Dep. at 102-04]. Plaintiff also submitted a complaint alleging that she was being harassed by Dr. Michael Christa, the lead physician at the Powder Springs Medical Center. [PSMF ¶¶ 7, 70; DSMF ¶ 54]. Plaintiff alleged that Dr. Christa had inquired into Plaintiff's reasons for the four-hour workday accommodation and her need for FMLA leave. [PSMF ¶ 70]. According to Plaintiff, Dr. Christa told her that he did not trust her because she would not tell him the medical reason why she needed FMLA and how long she needed FMLA, and also because he had an issue with her work restriction. [PSMF ¶ 71; Pla. Dep. at 94-95]. Plaintiff

testified that Dr. Christa told her that WellStar needed someone who was going to be at work all the time and every day, and that her using FMLA would not allow her to be there every day.  [PSMF ¶ 72; Pla. Dep. at 95].

On March 2, 2018, the day after Plaintiff complained, Assistant HR VP Joey Hunt and Senior HR Consultant Meili Villalba met with Plaintiff about her complaints. [DSMF ¶ 56].  Plaintiff told Hunt that she did not feel safe at the Powder Springs Medical Center since Dr. Christa did not trust her and since he was questioning her need for FMLA leave, which made Plaintiff fearful of losing her job. [PSMF ¶ 74].  In addition, Plaintiff sent an email to Hunt on March 2, 2018, telling him that she would be contacting the Equal Employment Opportunity Commission ("EEOC") as the work situation was creating more stress and anxiety for her as she felt that she was being forced out of her job and subjected to retaliation by Dr. Christa.  [PSMF ¶ 76; Hunt Dep., Ex. 43].  The same day, March 2, 2018, Hunt told Plaintiff that he would investigate the complaints.  Hunt also placed Plaintiff on administrative leave because she said that she felt "unsafe."  [PSMF ¶¶ 77, 78; DSMF ¶ 99].  March 1, 2018, was the last day that Plaintiff actually worked at WellStar.  [PSMF ¶ 82].  Plaintiff testified that she told Hunt that she did not feel safe because she was in fear of losing her job due to being questioned about her need for FLMA leave and ADA work accommodations, not because she was in fear for her physical safety.  [PSMF ¶ 79; Pla.

Dec. ¶ 8]. Dr. Christa and Adebayo were not placed on paid administrative leave during the investigation. [PSMF ¶¶ 73, 81].

On April 9, 2018, approximately a month after Plaintiff submitted her complaints, Hunt met with Plaintiff and informed her that he could not find that a hostile work environment had been created by Director of Patient Operations Adebayo. [PSMF ¶ 84; DSMF ¶ 58; Hunt Dep., Ex. 40]. Hunt also told Plaintiff that she would be removed from the Powder Springs location and that WellStar was going to have her work on a special project called the PCORI[2] project. In addition, Hunt told Plaintiff that she would eventually transfer to the Douglasville location, which would open in July or August, to be Office Manager once it opened. [PSMF ¶ 84; Hunt Dep., Ex. 42]. Hunt and Assistant VP Amber Thomas-Hutson testified that Plaintiff was going to be transferred due to employee concerns about Plaintiff at the Powder Springs location and in order to give Plaintiff a fresh start at another practice. [Hunt Dec. ¶ 13; Thomas-Huston ¶¶ 8, 9].

Hunt also told Plaintiff during the meeting on April 9, 2018, that she would be placed on an amended PIP. [Pla. Dep. at 108; Hunt Dep., Ex. 40]. Plaintiff testified:

> The April 9th meeting, [Hunt] informed me that the investigation against
> Wale [Adebayo] was unfounded. Basically there was no wrongdoing, so
> to speak. . . . [Hunt] then went ahead and stated that they were going to

_____

[2] PCORI is an acronym for Patient Centered Outcomes Research Institute and is an entity that funds projects aimed at improving health care. [DSMF ¶ 62].

be relocating me to . . . a special project being managed by Wale [Adebayo] and [Assistant VP Amber Thomas-Hutson] called the PCORI. . . . That I would be – and then moving on to the Douglasville office that was going to be opening at some undetermined date. The PCORI project, I didn't know anything about. I didn't know what . . . the job description would be. . . . He didn't disclose what the job functions would be.

[Pla. Dep. at 107]. The family medical office that was going to be opening in Douglasville, Georgia, was located on Prestley Mill Road. [DSMF ¶ 59]. Plaintiff would be the Office Manager of the Prestley Mill location and her salary and benefits would be the same. [DSMF ¶ 60]. Hunt told Plaintiff that "he would set up the meeting . . . to inform [Plaintiff] of what would be happening next with the PCORI project." [PSMF ¶ 89; Pla. Dep. at 107-08]. Hunt never spoke with Adebayo about Plaintiff joining the PCORI Project, or about providing a description of her role on the project. [PSMF ¶ 90]. Even though Hunt told Plaintiff the investigation into her complaints was completed on April 9, 2018, Plaintiff was not returned to work but remained on administrative leave. [PSMF ¶ 93].

On April 10, 2018, the day after Hunt's meeting with Plaintiff, Hunt emailed Plaintiff and informed her that she would be "working with Amber Thomas-Hutson and Adewale Adebayo on the PCORI project in an interim basis until the Prestley Mill practice in Douglasville is ready to open." [Pla. Dep., Ex. 3]. Hunt also informed Plaintiff, "You will have a meeting with Amber, Adewale, and myself to discuss this transition. . . ." [Id.]. Plaintiff responded in an email to Hunt by stating that although

her complaint was against both Adebayo and Dr. Michael Crista, "[t]here was no update on the piece involving Dr. Christa." [Pla. Dep., Ex. 3]. Plaintiff also reminded Hunt in the email that she had told him she was going to the EEOC for fear of retaliation from her supervisors. [PSMF ¶ 95; Hunt Dep., Ex. 40]. Plaintiff wrote, "[O]ut of concerns of retaliation, I did not feel safe working with Adewale Adebayo and Amber Thomas Hutson. In fact, due to my current health condition, I cannot meet with Mr. Adebayo or Ms. Hutson." [Id.]. Plaintiff never received an amended PIP and never received a job description for her role with the PCORI project. [PSMF ¶ 92].

The next day, April 11, 2018, Plaintiff filed a hotline complaint against Hunt, Christa, Adebayo, and Thomas-Hutson for the failure to complete an investigation into her complaints about Dr. Christa and because she believed that she was being transferred from the Powder Springs location because of her intermittent FMLA status, her prior complaints against her supervisors and HR, and her ADA accommodation request. [PSMF ¶ 98]. Defendant enlisted another Assistant HR VP, Stephanie Kallis, to investigate Plaintiff's complaint. [DSMF ¶ 73; Pla. Dep. at 113]. Plaintiff was on paid administrative leave during this time. [Pla. Dep. at 113]. On April 12, 2018, Plaintiff sent an email to Hunt, Adewale, and Thomas-Hutson informing them that she had retained legal representation. [DSMF ¶ 74; PSMF ¶ 96]. Plaintiff's former attorney sent a letter to WellStar dated April 17, 2018, stating that the company violated

Plaintiff's rights under the FMLA and ADA and demanding WellStar to investigate her claims. [PSMF ¶ 103].

On May 15, 2018, Kallis informed Plaintiff that she "did not reinvestigate [Plaintiff's] claims with Dr. Christa, Adewale Adebayo, and Amber Thomas Huston" because Kallis "felt these investigations were complete and fair." [Hunt Dec., Ex. 5]. However, Kallis wrote that she did "think there was a breakdown in communication about the ADA request" and that Hunt "was going to reach out to [Plaintiff] to discuss." [Id.]. Kallis also informed Plaintiff that Hunt was "going to talk to [Plaintiff] about returning to work." [Id.].

In the beginning of May 2018, Plaintiff spoke with Hunt on the telephone and asked if he had received the letter from Plaintiff's therapist, LCSW Robert Bryant, dated May 7, 2018. [Pla. Dep. at 121-22, Ex. 5]. Hunt told Plaintiff that he had not received it, so Plaintiff had the letter sent again. [Id.]. On May 15, 2018, Hunt emailed Plaintiff and informed her that her last day of administrative leave would be May 18, 2018, and that she was required to return to work on May 21, 2018 at 9am. Hunt told Plaintiff that she was to work on the PCORI project until the Douglasville location opened in July or August 2018. [Hunt Dep., Ex. 42]. In response, Plaintiff sent Hunt her intermittent FMLA approval and told him that she would be in therapy on Mondays, Wednesdays, and Thursdays from 9am to 12:30pm. [PSMF ¶ 107; Hunt Dep. at 149,

Exs. 20, 42].  Plaintiff also told Hunt that she would not be able to report at 9am on May 21, 2018, as she had been instructed.  [Hunt Dep, Ex. 42].  Hunt did not know that Plaintiff had been approved for intermittent FMLA before May 15, 2018.  [PSMF ¶ 108].  Plaintiff's paid administrative leave ended on May 18, 2018.  [PSMF ¶ 109].

Hunt and Plaintiff met on May 21, 2018, to discuss her requested accommodation.  Plaintiff testified that during the meeting with Hunt, "[W]e discussed the PCORI project, me still asking for job description and what I'd be doing.  We also discussed a transfer to anywhere other than the PCORI project."  [Pla. Dep. at 123-24].  Plaintiff gave Hunt the letter from her therapist.  [PSMF ¶ 110].  Although Hunt had informed Plaintiff that she was to work with Assistant VP Amber Thomas-Hutson and Director Adewale Adebayo when she returned, Plaintiff informed Hunt during the May 21st meeting that she could not work with Thomas-Hutson and Adebayo.  [Hunt Dep., Exs. 42, 44].  Plaintiff asked Hunt if she could transfer to another position in WellStar so that she would not have to report to Thomas-Hutson or Adebayo.  [PSMF ¶ 116].  Plaintiff also told Hunt that she would take a pay cut and that she did not need an Office Manager position.  [PSMF ¶¶ 117, 118].

Assistant HR VP Hunt testified that he sent Plaintiff Edwards home at this time because he needed to review the additional accommodation request from Plaintiff's therapist, LCSW Bryant.  [PSMF ¶ 112; Hunt Dep. at 131-32, Ex. 42].  The May 7th

letter from Plaintiff's therapist disclosed Plaintiff's diagnosis of major depression, described some of her symptoms, disclosed that she was on medication to help manage those symptoms, and stated that her current work assignment is causing her a significant amount of stress so that a transfer would be beneficial.  [PSMF ¶ 114]. Bryant testified that he drafted the letter because Plaintiff "certainly felt as if she was being treated unfairly at work and that to go back into that work environment would not be good for her.  And she, at the time, felt like she certainly wanted to continue to work for WellStar but just felt like she could do that better in a different position.  And not just in a different position, but I think it's fair to say under different leadership structure."  [DSMF ¶ 81; Bryant Dep. at 19].  Other than a change in management structure, Bryant was not aware of any other changes that needed to be made to enable Plaintiff to perform the duties of her position.  [DSMF ¶ 82; Bryant Dep. at 20].  Hunt did not contact Plaintiff's therapist about the May 7, 2018 letter to discuss the accommodation request.  [PSMF ¶ 119].  Hunt did not ask Plaintiff to get a second opinion about her May 7, 2018 accommodation request.  [PSMF ¶ 120].  Hunt never looked to see if there was another location or position available for Plaintiff that would not have her reporting to Thomas-Hutson or Adebayo.  [PSMF ¶ 121].

Plaintiff testified that on May 21, 2018, while remaining on paid administrative leave, she met with Hunt and Senior HR Consultant Meili Villalba.  [Pla. Dep. at 122,

126].   During this meeting, Plaintiff again provided the May 7th letter from her therapist.  [DSMF ¶ 78; Pla. Dep. at 123, Ex. 5].  During the meeting with Hunt and Villalba on May 21, 2018, Plaintiff asked to be transferred to a different manager, but she did not request any other accommodation.  [DSMF ¶ 85].  At this meeting, Plaintiff again told Hunt that she could not work with Thomas-Hutson and Adebayo because of their unprofessional behavior.  [DSMF ¶ 86].  At the end of the May 21st meeting, Hunt told Plaintiff that he would get back to her.  [DSMF ¶ 87].

On May 25, 2018, Hunt wrote an email and letter to Plaintiff stating that her request to be transferred to a different manager was not a reasonable accommodation under the ADA.  [PSMF ¶ 122; DSMF ¶ 88; Hunt Dep., Ex. 46].  Hunt claimed that a transfer to another manager was not a reasonable accommodation because it was asking to change the structure of the organization.  [PSMF ¶ 123].  In the May 25th email to Plaintiff, Hunt wrote, "If there is a different accommodation you would like to request or any other information you would like to provide regarding your ability to work in your position, please let me know by June 1, 2018.  Otherwise, WellStar will make a decision regarding your employment on that date based on the information you previously provided."  [Id.].

Later that same day, Plaintiff responded by email, stating, "[D]ue to my mental health condition (please refer to physician statement) the following reasonable

accommodations have been determined 'a reasonable accommodation' under the [ADA]." [Hunt Dep., Ex. 45].  Plaintiff also wrote: "If I am to remain under the management/supervision of Adewale Adebayo and Amber Thomas-Hutson, I am respectfully making the following reasonable accommodation requests[.]"  [Id.]. Plaintiff then listed numerous accommodations that she was requesting, including: telecommuting and/or working from home on an as-needed basis; reduction and/or removal of distractions; tape recorders for recording/reviewing meetings and training; additional assistance and/or time for orientation activities, training, and learning job tasks and new responsibilities; implementation of flexible and supportive supervision style; positive reinforcement and feedback; development of strategies to deal with problems before they arise; requiring all meetings to be scheduled at least a week in advance, with the agenda and attendees to be disclosed when the meeting is scheduled; and requiring any cancellation, rescheduling, or postponing of meetings to be done so in writing and with an explanation at least 24 hours in advance.  [DSMF ¶ 89; Hunt Dep., Ex. 45].  Plaintiff concluded the email by writing, "I look forward to getting your update regarding my reasonable accommodations."  [Hunt Dep., Ex. 45].

On June 5, 2018, Assistant HR VP Hunt responded to Plaintiff via email and letter seeking clarification about whether she was "requesting all the stated modifications or whether [she] believe[d] that any of them individually will allow [her]

to perform the essential functions of [her] position."  [DSMF ¶ 90; Hunt Dep., Ex. 47].

Hunt also asked Plaintiff for specific information about the nature of the requested

accommodations.  [Id.].  Hunt did not meet with Plaintiff in person or ask her to provide

any medical documentation to support her May 25, 2018 accommodation requests.

[PSMF ¶¶ 129, 130].  Hunt did not have any conversations with Plaintiff between her

requests on May 25, 2018, and WellStar's response on June 5, 2018.  [PSMF ¶ 128].

On June 5, 2018, Plaintiff responded to Hunt via email.  [Hunt Dep., Ex. 48].

Plaintiff explained that as the Office Manager at the Powder Springs location, she had

to endure highly stressful situations such as driving twenty miles in the middle of the

night to relocate vaccines due to a faulty medical refrigeration.  [Id.].  Plaintiff also

stated that she was required to handle all emergency situations, such as multiple natural

gas leaks and major plumbing issues, and that she had to deal with angry patients,

physicians, and staff during the emergencies.  [Id.].  In addition, Plaintiff explained that

she had been diagnosed with depressive disorder with anxious stress, and she described

her symptoms.  [Id.].  Plaintiff then requested numerous "cost effective reasonable

accommodations," including: adjustments in the start or end of work hours on an as-

needed basis; due to health conditions and/or medication side effects; flexibility in

scheduling breaks; reduction and/or removal of distractions; tape recorders for

recording/reviewing meetings and training sessions; additional assistance and/or time

21

for orientation or re-acclimation; additional training or modified training materials; implementation of flexible and supportive supervision style; positive reinforcement and feedback; additional forms of communications and/or written and visual tools; regularly scheduled meetings (weekly) to discuss workplace issues and productivity; development of strategies to deal with problems before they arise; requiring all meetings to be scheduled at least a week in advance, with the agenda and attendees to be disclosed when the meeting is scheduled; and requiring any cancellation, rescheduling, or postponing of meetings to be done so in writing and with an explanation at least 24 hours in advance. [DSMF ¶ 92; Hunt Dep., Ex. 48]. Plaintiff concluded by writing: "Please let me know if you need medical documentation of my disability and need for accommodation. I look forward to meeting with you to discuss options for accommodating my disability." [Hunt Dep., Ex. 48].

Plaintiff Edwards testified that when she sent the email on June 5, 2018, she understood that she would be working on the PCORI project and then ultimately transferred to the Prestley Mill office. [DSMF ¶ 93; Pla. Dep. at 144]. Plaintiff testified that the requests that she presented in her emails were options that she cut and pasted "directly" from "the ADA website." [DSMF ¶ 94; Pla. Dep. at 145]. Plaintiff cannot remember if she copied "all" of the options or just "a lot" of the options. [DSMF ¶ 95; Pla. Dep. at 147].

Hunt responded to Plaintiff's email in a letter and email dated June 8, 2018. [Hunt Dep., Ex. 49].  Hunt wrote the following:

> I have reviewed your requested accommodations as set forth in your e-mail of June 5, 2018.  The requested accommodations would create an undue burden on WellStar in that they are unduly extensive, substantial, and disruptive.  Not only would some of the requested accommodations make it impractical for the department to operate – i.e., scheduling all meetings a week in advance and providing an agenda and attendee list for all meetings – many of the requested accommodations are too general to implement in any meaningful way – i.e., development of strategies to deal with problems before they arise.  Therefore, I am unable to grant your request.  At this point, we have provided you with multiple opportunities to identify a reasonable accommodation that would allow you to perform the essential functions of your position.  You have not done so.  Accordingly, I can only conclude that no such accommodation exists, and WellStar is terminating your employment effective immediately.

[Hunt Dep., Ex. 49].  Hunt was the sole decisionmaker for Plaintiff's termination on June 8, 2018.  [PSMF ¶ 151].

Additional facts will be set forth as necessary during discussion of Plaintiff's claims.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the initial responsibility of asserting the basis for its motion.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Apcoa, Inc. v. Fidelity Nat'l Bank, 906 F.2d 610, 611 (11th Cir. 1990).  The movant is

not required, however, to negate its opponent's claim; the movant may discharge its burden by merely "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325. After the movant has carried its burden, the non-moving party is then required to "go beyond the pleadings" and present competent evidence designating specific facts showing that there is a genuine disputed issue for trial; the non-moving party may meet its burden through affidavit and deposition testimony, answers to interrogatories, and the like. Id. at 324 (quoting Fed. R. Civ. P. 56(e)).

While the court is to view all evidence and factual inferences in a light most favorable to the non-moving party, Nat'l Parks Conservation Ass'n v. Norton, 324 F.3d 1229, 1236 (11th Cir. 2003), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is material when it is identified as such by the controlling substantive law. Id. at 248. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). Instead, "the nonmoving party must present evidence beyond the pleadings showing that a reasonable jury could

find in its favor." Fickling v. United States, 507 F.3d 1302, 1304 (11th Cir. 2007) (citing Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990)). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." Anderson, 477 U.S. at 249-50. Thus, the Federal Rules mandate the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of *every* element essential to that party's case on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 322.

## III.  DISCUSSION

In Plaintiff Cindy Edwards' Amended Complaint, Count One alleges that Defendant WellStar subjected her to retaliation in violation of the FMLA. [Doc. 14 ¶¶ 37-44]. Plaintiff alleges in Count Two that Defendant interfered with her right to take FMLA leave. [Id. ¶¶ 45-50]. Plaintiff asserts in Count Three that Defendant violated the ADA when the company "regarded her as disabled." [Id. ¶¶ 51-57]. In Count Four, Plaintiff brings an ADA claim for disability discrimination and failure to accommodate. [Id. ¶¶ 58-68]. Plaintiff's final claim asserted in Count Five is for retaliation based on the ADA. [Id. ¶¶ 69-76].

### A.    Plaintiff's ADA "Regarded As" Claim

The Court notes initially that Defendant WellStar has moved for summary

judgment on all claims asserted by Plaintiff Edwards.  [Doc. 31].  Plaintiff, however, has stated that she does not oppose summary judgment on her "regarded as disabled" claim brought pursuant to the ADA.   [Doc. 35 at 7 n.3].   It is, therefore, **RECOMMENDED** that Defendant's summary judgment motion [Doc. 31] be **GRANTED** on Plaintiff's ADA "regarded as disabled" claim asserted in Count Three of her Amended Complaint [Doc. 14, Count Three].

### B.     FMLA Interference Claim

The FMLA provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following: . . . (D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1).  The Eleventh Circuit has recognized that the FMLA "creates two types of claims: interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act." Hurlbert v. St. Mary's Health Care System, Inc., 439 F.3d 1286, 1293 (11th Cir. 2006) (citation and internal quotation marks omitted).  In the present case, Plaintiff Edwards has asserted both an FMLA interference claim and a retaliation claim.  [Doc. 14, Counts One, Two].  The Court will first address Plaintiff's claim in

Count Two that Defendant WellStar interfered with her right to take FMLA leave.  [Id. ¶¶ 45-50].

The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."  29 U.S.C. § 2615(a)(1).  "To prove FMLA interference, an employee must demonstrate that [she] was denied a benefit to which [she] was entitled under the FMLA."  Martin v. Brevard County Public Schools, 543 F.3d 1261, 1266-67 (11th Cir. 2008) (per curiam).  Thus, "[a]n interference claim has two elements: (1) the employee was entitled to a benefit under the FMLA, and (2) her employer denied her that benefit."  White v. Beltram Edge Tool Supply, Inc., 789 F.3d 1188, 1191 (11th Cir. 2015) (citing Krutzig v. Pulte Home Corp., 602 F.3d 1231, 1235 (11th Cir. 2010)).  "An employer may be liable for interference despite good intentions; its 'motives are irrelevant.'"  Id. at 1191 n.2 (quoting Krutzig, 602 F.3d at 1235).

Plaintiff asserts in her Amended Complaint that she "was approved for intermittent FMLA leave from February 23, 2018 through February 23, 2019 in order for her to attend medical appointments and take sick days for her serious health condition."  [Doc. 14 ¶ 45].  According to Plaintiff, WellStar interfered with her right to take FMLA leave when the company terminated her employment on June 8, 2018.  [Id. ¶ 46].  Defendant WellStar argues Plaintiff's FMLA interference claim cannot

survive summary judgment because Plaintiff cannot show that she was entitled to additional leave under the FMLA. [Doc. 31-1 at 12-13]. Although Plaintiff alleges in her Complaint that she was approved for intermittent FMLA leave between February 23, 2018 and February 23, 2019, Defendant contends that Plaintiff had already used her 12-week allotment of FMLA leave as of February 23, 2018. [Id.]. Plaintiff, however, argues that there is no evidence to support Defendant's contention and that no one at WellStar ever told her that she did not qualify for intermittent leave. [Doc. 35 at 32]. The Court finds Plaintiff's arguments unpersuasive and concludes that she was not denied an FMLA benefit to which she was entitled.[3]

The relevant FMLA regulations provide, "[A]n eligible employee's FMLA leave entitlement is limited to a total of 12 workweeks of leave during any 12-month period[.]" 29 C.F.R. § 825.200(a). In determining the 12-month period in which the 12 weeks of leave entitlement occurs, an employer may choose from a number of methods, including a "'rolling' 12–month period measured backward from the date an employee uses any FMLA leave[.]" 29 C.F.R. § 825.200(b). WellStar's Family and

---

[3] Plaintiff also contends that when she was not allowed to return to work on March 2, 2018, WellStar interfered with her right to accrue the 1,250 work hours needed in order to become FMLA eligible again. [Doc. 35 at 32]. But as Defendant notes, the relevant issue with regard to Plaintiff's FMLA interference claim is not whether Plaintiff was given the opportunity to work enough hours to accrue additional FMLA leave, but whether WellStar denied her the FMLA leave to which she was entitled. [Doc. 49 at 18 n.8].

Medical Leave Policy uses the rolling 12-month period for determining the 12 weeks of FMLA leave to which each eligible employee is entitled.  [Hunt Dep., Ex. 3 at 9]. The policy provides, "A rolling 12-month period is measured backward from the date the leave of absence is to begin."  [Id.].

The record reveals that Plaintiff Edwards was on FMLA leave from Monday, October 16, 2017 until February 23, 2018.  [DSMF ¶¶ 47, 50; PSMF ¶¶ 55, 56; Hunt Dep. at 114; Pla. Dep. at 88].  During her deposition, Plaintiff was asked and testified to the following:

> Q.  How long did you remain on FMLA leave?
> A.  I was on FMLA from October 2017 to February 23, 2018.

[Pla. Dep. at 88].  Plaintiff was also on FMLA leave for 14 weeks from May 16, 2017 to August 21, 2017.  [Doc. 35 at 21; PSMF ¶ 17; DSMF ¶ 21].  Thus, the evidence establishes that Plaintiff took more than 32 weeks of FMLA leave between May 16, 2017 and February 23, 2018.  Although Plaintiff requested and was granted intermittent FMLA leave beginning February 22, 2018, this does not change the fact that Plaintiff had already used more than 12 weeks of FMLA leave during the prior rolling 12-month period.  [PSMF ¶¶ 56, 67].

"A Plaintiff claiming interference must demonstrate by a preponderance of the evidence that she was denied a benefit to which she was entitled."  Pereda v. Brookdale Senior Living Communities, Inc., 666 F.3d 1269, 1274 (11th Cir. 2012) (citation and

29

internal quotation marks omitted).  Plaintiff Edwards is unable to make this showing.

Plaintiff asserts in her Amended Complaint that Defendant interfered with her right to

take FMLA leave when WellStar terminated her employment on June 8, 2018.  [Doc.

14 ¶ 46].  But Plaintiff has failed to point to evidence showing that she was entitled to

additional FMLA leave.  Plaintiff was entitled to 12 weeks of leave under the FMLA

and she was granted much more than this by Defendant WellStar during the 12-month

rolling period prior to her termination.  "[A]n employer does not interfere with an

employee's right to reinstatement if that employee is terminated after taking leave in

excess of the 12 weeks permitted by the FMLA."  Jones v. Gulf Coast Health Care of

Delaware, LLC, 854 F.3d 1261, 1268 (11th Cir. 2017).

        Although Plaintiff notes that Defendant approved her intermittent FMLA leave

from February 23, 2018 through February 23, 2019, this fact is not relevant to her

FMLA interference claim.  This Court has explained: "[T]he fact that Defendant

granted Plaintiff additional unpaid leave – and even called it FMLA leave – cannot

extend the statute's fixed entitlement of 12 weeks."  Meade v. General Motors LLC,

317 F. Supp. 3d 1259, 1279 (N.D. Ga. 2018).  Because the record establishes that

Plaintiff used all of her FMLA leave prior to her termination on June 8, 2018, a

reasonable jury could not find that Plaintiff was denied a benefit under the FMLA to

which she was entitled.  See Giles v. Daytona State Coll., Inc., 542 F. App'x 869, 875

(11th Cir. 2013) ("The record confirms that Giles used all of her available FMLA leave on June 22, 2009, and thus, there is no evidence that she was denied an FMLA benefit to which she was entitled."); Meade, 317 F. Supp. 3d at 1279 ("Plaintiff cannot prevail on her FMLA interference claim under governing Eleventh Circuit law as she was not entitled to more FMLA leave when it was denied.").   The Court, therefore, **RECOMMENDS** that Defendant's summary judgment motion [Doc. 31] be **GRANTED** on Plaintiff's FMLA interference claim [Doc. 14, Count Two].

### C.   ADA Discrimination Claim

In Count Four of her Amended Complaint, Plaintiff Edwards brings an ADA claim for disability discrimination and failure to accommodate.  [Doc. 14 ¶¶ 58-68]. "The ADA prohibits employers from discriminating against 'a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.'" Batson v. Salvation Army, 897 F.3d 1320, 1326 (11th Cir. 2018) (quoting 42 U.S.C. § 12112(a)).  To establish a *prima facie* case of disability-based discrimination under the ADA, a plaintiff must demonstrate that: (1) she has a disability as defined in the ADA; (2) she is a "qualified individual," meaning that, with or without reasonable accommodations, she can perform the essential functions of the job she holds; and (3) she was discriminated against because

of her disability.  See Mazzeo v. Color Resolutions Int'l, LLC, 746 F.3d 1264, 1268 (11th Cir. 2014) (citing Holly v. Clairson Industries, L.L.C., 492 F.3d 1247, 1256 (11th Cir. 2007)); Greenberg v. BellSouth Telecommunications, Inc., 498 F.3d 1258, 1263 (11th Cir. 2007).  The ADA's definition of "discriminate" includes a failure to make reasonable accommodations to the limitations of an individual with a disability.[4]  See 42 U.S.C. § 12112(b)(5)(A).  "Thus, an employer's failure to reasonably accommodate a disabled individual *itself* constitutes discrimination under the ADA, so long as that individual is 'otherwise qualified,' and unless the employer can show undue hardship."  Holly, 492 F.3d at 1262 (emphasis in original).

Plaintiff alleges in her Amended Complaint that on May 25, 2018 and June 5, 2018, she requested accommodations from Defendant WellStar related to her disabilities.  [Doc. 14 ¶ 63].  According to Plaintiff, "WellStar refused to grant Ms. Edwards' requested accommodation based on discriminatory discipline and because of her disability."  [Id. ¶ 64].  The first *prima facie* element requires Plaintiff to show that

---

[4]   The burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973), does not apply to reasonable accommodation claims.  See Nadler v. Harvey, 2007 WL 2404705, at *8 (11th Cir. August 24, 2007) ("An employer *must* reasonably accommodate an otherwise qualified employee with a *known* disability unless the accommodation would impose an undue hardship in the operation of the business. . . . Thus, applying McDonnell Douglas to reasonable accommodation cases would be superfluous, since there is no need to prove discriminatory motivation.") (emphasis in original).

she has a disability as it is defined under the ADA.  The relevant provision of the ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual."  42 U.S.C. § 12102(1)(A).  The record reveals that Plaintiff has been diagnosed with major depression and anxiety disorder. [Pla. Dep., Ex. 5; Hunt Dep., Ex. 48].  Defendant acknowledges that Plaintiff's mental impairments constitute disabilities under the ADA.  [Doc. 31-1 at 15].

The second *prima facie* element requires Plaintiff to show that she is a "qualified individual," which the ADA defines as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  "Accordingly, an ADA plaintiff must show either that [she] can perform the essential functions of [her] job without accommodation, or, failing that, show that [she] can perform the essential functions of [her] job with a reasonable accommodation."  D'Angelo v. ConAgra Foods, Inc., 422 F.3d 1220, 1229 (11th Cir. 2005) (citation and internal quotation marks omitted).  "The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires.  The term 'essential functions' does not include the marginal functions of the position."  29 C.F.R. § 1630.2(n)(1).  If a plaintiff cannot perform an essential function of her job, even with a reasonable accommodation, then she is not a "qualified individual" and is unable to

establish a *prima facie* case.  See <u>Davis v. Florida Power & Light Co.</u>, 205 F.3d 1301, 1305 (11th Cir. 2000).

Defendant WellStar contends that the evidence in the record establishes that Plaintiff was not a "qualified individual." [Doc. 31-1 at 15-19].  Defendant's argument is based on its assertion that Plaintiff's requested accommodations were not reasonable. [<u>Id.</u>].  Courts have found that a plaintiff is not a "qualified individual" under the ADA if the requested accommodation would prevent the plaintiff from performing the essential functions of her job and, therefore, was not reasonable.  See <u>Everett v. Grady Mem'l Hosp. Corp.</u>, 703 F. App'x 938, 943 (11th Cir. 2017); <u>Spears v. Creel</u>, 607 F. App'x 943, 950 (11th Cir. 2015) ("[T]he district court properly granted summary judgment to the Sheriff on the basis that Spears was not a 'qualified individual' under the ADA because she had failed to identify a reasonable accommodation that would allow her to perform the essential job functions of an available position with the Sheriff."); <u>Meade</u>, 317 F. Supp. 3d at 1275-76 (finding that plaintiff was not qualified because being present on the job was essential, she was absent 47 days out of the 100 total work days from August through December 2015, and she did not request "more flexibility in her work location; she just framed her request as seeking more leave").

When Plaintiff returned from FMLA leave on February 23, 2018, she asked for a reduced schedule of four hours per day based on a recommendation by her doctor.

[PSMF ¶ 60; DSMF ¶ 51; Pla. Dep. at 90, 94]. The reduced schedule was to be for thirty days and her reduced hours were 8am to 12pm three days a week and 1pm to 5pm two days a week for inpatient treatment. [PSMF ¶¶ 61, 62; Pla. Dep. at 94]. Plaintiff's requested accommodation was approved and she returned to work. [DSMF ¶ 52; Pla. Dep. at 91]. On March 2, 2018, Assistant HR VP Joey Hunt placed Plaintiff on administrative leave after she had made complaints and stated that she felt "unsafe." [PSMF ¶¶ 77, 78; DSMF ¶ 99]. On April 9, 2018, approximately a month after Plaintiff submitted her complaints, Hunt met with Plaintiff. [PSMF ¶ 84; DSMF ¶ 58; Hunt Dep., Ex. 40]. During this meeting, Hunt told Plaintiff that she would be removed from the Powder Springs location and transferred to the PCORI project which was going to be managed by Director of Patient Operations Adewale Adebayo and Assistant VP Amber Thomas-Hutson. [Pla. Dep. at 107]. Hunt also told Plaintiff during the meeting on April 9, 2018, that she would eventually transfer to the Douglasville location, which would open in July or August, to be Office Manager once it opened. [PSMF ¶ 84; Hunt Dep., Ex. 42; Pla. Dep. at 107].

The next day, April 10, 2018, Hunt emailed Plaintiff and again informed her that she would be "working with Amber Thomas-Hutson and Adewale Adebayo on the PCORI project in an interim basis until the Prestley Mill practice in Douglasville is ready to open." [Pla. Dep., Ex. 3]. Hunt also informed Plaintiff, "You will have a

meeting with Amber, Adewale, and myself to discuss this transition. . . ."   [Id.].

Plaintiff responded in an email to Hunt by writing, *inter alia*, "[O]ut of concerns of

retaliation, I did not feel safe working with Adewale Adebayo and Amber Thomas

Hutson.  In fact, due to my current health condition, I cannot meet with Mr. Adebayo

or Ms. Hutson."  [Id.].

Plaintiff argues that because she was going to be transferred to the PCORI

project on an interim basis, the relevant issue is not whether she could perform the

essential functions of the Office Manager job but whether she could perform the

essential functions of the job on the PCORI project, with or without reasonable

accommodation.  [Doc. 35 at 7-10].  Furthermore, according to Plaintiff, because she

was never informed about what she would be doing on the PCORI project and was not

given a job description for the project, she should not be required to show that she could

perform the essential functions of the job.  [Id.].  Plaintiff's argument is lacking.  As

noted *supra*, Plaintiff was informed by Hunt that she would be working with Thomas-

Hutson and Adebayo on the PCORI project on an interim basis and that she would have

a meeting with Hunt, Thomas-Hutson, and Adebayo to "discuss this transition."  [Pla.

Dep., Ex. 3].  However, Plaintiff responded by writing, "[D]ue to my current health

condition, I cannot meet with Mr. Adebayo or Ms. Hutson."  [Id.].  In other words,

although Hunt instructed Plaintiff to meet with Thomas-Huston and Adebayo to discuss

the PCORI project, Plaintiff told Hunt that she was not even able to meet with them because of her health condition.[5]

On May 21, 2018, Plaintiff met with Hunt and Senior HR Consultant Meili Villalba. [Pla. Dep. at 122, 126]. Plaintiff again stated that she could not work with Thomas-Hutson and Adebayo. [Hunt Dep., Exs. 42, 44]. Plaintiff asked if she could transfer to another position in WellStar so that she would not have to report to Thomas-Hutson or Adebayo, but she did not request any other accommodation. [PSMF ¶ 116; DSMF ¶ 85]. Hunt informed Plaintiff that her request to be transferred to a different manager was not a reasonable accommodation under the ADA. [PSMF ¶ 122; DSMF ¶ 88; Hunt Dep., Ex. 46].

Plaintiff contends that her request for a transfer so that she would have different supervisors constitutes a reasonable accommodation request. [Doc. 35 at 14-15]. However, Plaintiff has not identified any authority holding that a transfer to a different supervisor is a reasonable accommodation. In fact, numerous courts addressing the issue have come to the exact opposite conclusion and have specifically held, "A transfer from an incompatible supervisor is not a 'reasonable accommodation.'" <u>Santandreu v.</u>

---

[5] One job duty that was going to be required of Plaintiff on the interim PCORI project was to work under the supervision of Thomas-Huston and Adebayo. Plaintiff is correct that she was not informed of what other duties would have been required of her, but this was because she refused to meet with Thomas-Huston and Adebayo to discuss the PCORI project.

Miami-Dade County, No. 10-24616-CIV, 2011 WL 13136161, at *11 (S.D. Fla. Aug. 1, 2011), aff'd, 513 F. App'x 902 (11th Cir. 2013) (citing Gaul v. Lucent Techs., Inc., 134 F.3d 576, 581 (3d Cir. 1998)); accord EEOC Enforcement Guidance on Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, Question 33 (EEOC Notice No. 915.002, Oct. 17, 2002) ("An employer does not have to provide an employee with a new supervisor as a reasonable accommodation."). "[B]y asking to be transferred away from individuals who cause [her] prolonged and inordinate stress, [Plaintiff] is essentially asking this court to establish the conditions of [her] employment, most notably, with whom [she] will work." Gaul, 134 F.3d at 581. But as the Second Circuit has explained, "[N]othing in the law leads us to conclude that in enacting the disability acts, Congress intended to interfere with personnel decisions within an organizational hierarchy. Congress intended simply that disabled persons have the same opportunities available to them as are available to nondisabled persons." Wernick v. Fed. Reserve Bank of New York, 91 F.3d 379, 384 (2d Cir. 1996). Because Plaintiff's request to be transferred away from Thomas-Huston and Adebayo was not a request for a reasonable accommodation, she is unable to show that she was a qualified individual based on this request.

The next issue the Court must address is whether Plaintiff can establish that she was a qualified individual by showing that her other requested accommodations were

reasonable.  On May 25, 2018, Assistant HR VP Joey Hunt informed Plaintiff via email and letter that her request to be transferred to a different manager was not a reasonable accommodation under the ADA.  [PSMF ¶ 122; DSMF ¶ 88; Hunt Dep., Ex. 46].  In the May 25th email to Plaintiff, Hunt also wrote, "If there is a different accommodation you would like to request or any other information you would like to provide regarding your ability to work in your position, please let me know by June 1, 2018.  Otherwise, WellStar will make a decision regarding your employment on that date based on the information you previously provided."  [Id.].

Later that same day, Plaintiff responded by email, stating, "[D]ue to my mental health condition (please refer to physician statement) the following reasonable accommodations have been determined 'a reasonable accommodation' under the [ADA]."  [Hunt Dep., Ex. 45].  Plaintiff also wrote:

> If I am to remain under the management/supervision of Adewale Adebayo and Amber Thomas-Hutson, I am respectfully making the following reasonable accommodation requests:
>
> • Telecommuting and/or working from home (on an as-needed basis due to medication side effects).
>
> • Part-time work hours, job sharing, adjustments in the start or end of work hours (as needed due to medication side effects).
>
> • Sick leave for reasons related to mental health, flexible use of vacation time, additional unpaid or administrative leave for treatment or recovery, leaves of absence and/or use of occasional leave (a few hours at a time) for therapy and other related appointments.

● Breaks according to individual needs rather than a fixed schedule, more frequent breaks and/or greater flexibility in scheduling breaks, provision of backup coverage during breaks, and telephone breaks during work hours to call professionals and others needed for support.

● Reduction and/or removal of distractions in the work areas.

● Tape recorders for recording/reviewing meetings and training sessions (due to medication side effects and symptoms of my health condition).

● Modification or removal of non-essential job duties or restrictions of the job to include only the essential job functions.

● Division of large assignments into smaller tasks or goals.

● Additional assistance and/or time for orientation activities, training and learning job tasks and new responsibilities (based on my individual needs).

● Additional training or modified training materials (based on my individual needs).

● Implementation of flexible and supportive supervision style; POSITIVE reinforcement and feedback; adjustments in the level of supervision or structure, such as more frequent meetings to help prioritize my daily tasks, and open communication DIRECTLY with supervisors regarding performance and work expectations.

● Additional forms of communication and/or written and visual tools, including communication of assignments and instructions in my preferred learning style (written, or e-mail demonstration) creation and implementation of written tools such as daily "to-do" lists, step-by-step checklists, written, in additional to typed minutes of meetings.

● Regularly scheduled meetings (weekly) to discuss workplace issues and productivity, including annual discussions as part of performance appraisals to assess abilities and discuss promotional opportunities.

● Development of strategies to deal with problems BEFORE they arise.

● Written work agreements that include any agreed upon accommodations, long-term and short-term goals, expectations of responsibilities and performance standards.

● ALL meetings must be scheduled with at least a week prior notice. The meeting agenda and attendees must be disclosed at the time the meeting is scheduled.

● Any cancellation, rescheduling or postponing meetings will need to be done so in writing with explanation at least 24 hours in advance.

● There will be no behavior or violation of the code of conduct of any kind that will exacerbate my mental health condition.

[DSMF ¶ 89; Hunt Dep., Ex. 45 (emphasis in original)].  Plaintiff concluded the email by writing, "I look forward to getting your update regarding my reasonable accommodations."  [Hunt Dep., Ex. 45].

On June 5, 2018, Assistant HR VP Joey Hunt responded to Plaintiff via email and letter seeking clarification about whether she was "requesting all the stated modifications or whether [she] believe[d] that any of them individually will allow [her] to perform the essential functions of [her] position."  [DSMF ¶ 90; Hunt Dep., Ex. 47]. Hunt also asked Plaintiff: "[P]lease provide specific information about the nature of the requested accommodation(s).  For example, you request additional training without identifying what training you believe you need or providing any information about how this will allow you to perform in the position considering your health condition."  [Id.].

In addition, Hunt informed Plaintiff that "the purpose of an accommodation is to allow an employee to perform the essential functions of her position that she cannot otherwise perform because of her health condition, and is not an opportunity to request any and all changes to the workplace the employee would like to see happen." [DSMF ¶ 91; Hunt Dep., Ex. 47].

On June 5, 2018, Plaintiff responded to Hunt via email. [Hunt Dep., Ex. 48]. Plaintiff explained that as the Office Manager at the Powder Springs location, she had to endure highly stressful situations such as driving twenty miles in the middle of the night to relocate vaccines due to a faulty medical refrigeration. [Id.]. Plaintiff also stated that she was required to handle all emergency situations, such as multiple natural gas leaks and major plumbing issues, and that she had to deal with angry patients, physicians, and staff during the emergencies. [Id.]. In addition, Plaintiff explained that she had been diagnosed with depressive disorder with anxious stress, and she described her symptoms. [Id.]. Plaintiff then requested "the following cost effective reasonable accommodations":

> ● Adjustments in the start or end of work hours (as needed due to health conditions and/or medication side effects).
>
> ● Sick leave for reasons related to mental health, flexible use of vacation time, additional unpaid or administrative leave for treatment or recovery, leaves of absence and/or use of occasional leave (a few hours at a time) for therapy and other related appointments. . . .

● Flexibility in scheduling breaks, and telephone breaks during work hours to call professionals and others needed for mental health support.

● Reduction and/or removal of distractions in the work area.

● Tape recorders for recording/reviewing meetings and training sessions (due to medication side effects and symptoms of my health condition).

● Modification or removal of non-essential job duties or restructuring of the job to include only the essential job functions (due to health condition).

● If you are removing me from the Powder Springs Medical Center. Additional assistance and/or time for orientation activities, training and learning job tasks and new responsibilities (based on my individual needs).  If I'm remaining at Powder Springs, additional assistance and/or time to get re-acclimated with my work environment.  I have been away for quite some time and [sic] because of the depressive disorder symptoms.

● Additional training or modified training materials that will assist me in learning my new job or getting re-acclimated with my current job (based on my individual needs).

● Due to the symptoms of anxiety and depression, the implementation of flexible and supportive supervision style; POSITIVE reinforcement and feedback; adjustments in level of supervision or structure, such as more frequent meetings to help prioritize my daily tasks; and open communications DIRECTLY (not a third party) with supervisors regarding performance and work expectations.

● Due to anxiety and depression, additional forms of communications and/or written and visual tools, including communication of assignments and instructions in my preferred learning style . . . creation and implementation of written tools such as daily "to-do" lists, step-by-step checklists, written (in addition to typed minutes of meetings).

● Regularly scheduled meetings (weekly) to discuss workplace issues and productivity, including annual discussions as part of performance

appraisals to assess abilities and discuss promotional opportunities/ performance deficiencies.

● Development of strategies to deal with problems BEFORE they arise.

●   Written work agreements that include any agreed upon accommodations, long-term and short-term goals, expectations of responsibilities and performance standards.

● Due to my anxiety ALL meetings must be scheduled with at least a week prior notice.  The meeting agenda and attendees must be disclosed at the time the meeting is scheduled.

● Due to my depressive/anxiety disorder, any cancellation, rescheduling or postponing of meetings will need to be done so in writing with explanation at least 24 hours in advance.

● Due to my major depressive/anxiety disorder, there will be no behavior or violation of the code of conduct of any kind that will exacerbate my mental health condition.

[DSMF ¶ 92; Hunt Dep., Ex. 48 (emphasis in original)].

Hunt responded to Plaintiff's email in a letter and email dated June 8, 2018. [Hunt Dep., Ex. 49].   Hunt wrote that he had reviewed Plaintiff's requested accommodations in her June 5th email.  [Hunt Dep., Ex. 49]  Hunt stated that he was unable to grant Plaintiff's request because "some of the requested accommodations make it impractical for the department to operate – i.e., scheduling all meetings a week in advance and providing an agenda and attendee list for all meetings" and because "many of the requested accommodations are too general to implement in any meaningful way – i.e., development of strategies to deal with problems before they

arise."  [Id.].  Hunt then stated, "At this point, we have provided you with multiple opportunities to identify a reasonable accommodation that would allow you to perform the essential functions of your position.  You have not done so."  [Id.].  Hunt wrote, "Accordingly, I can only conclude that no such accommodation exists, and WellStar is terminating your employment effective immediately."  [Id.].  Hunt was the sole decisionmaker for Plaintiff's termination on June 8, 2018.  [PSMF ¶ 151].

The Court finds that Plaintiff has failed to show that her requested accommodations were reasonable and, therefore, she has not established that she was a qualified individual under the ADA.  Plaintiff's emails to Assistant HR VP Hunt included many requests which courts have found to be unreasonable as a matter of law, as discussed *infra*.  [Hunt Dep., Ex. 45].  Moreover, the evidence reveals that WellStar made a reasonable effort to determine an appropriate accommodation when Plaintiff submitted her numerous requests.  See Bralo v. Spirit Airlines, Inc., No. 13-60948-CIV, 2014 WL 1092365, at *16 (S.D. Fla. Mar. 19, 2014) ("An employer who is aware of its responsibility to provide a reasonable accommodation must make a reasonable effort to determine the appropriate accommodation.") (citation and internal quotation marks omitted).  Hunt provided Plaintiff with numerous opportunities to identify reasonable accommodations to her disability, but Plaintiff refused to identify any accommodations that were reasonable.

Plaintiff claims that Defendant WellStar did not comply with its ADA policy which "requires an employee requesting an accommodation to provide supporting medical documentation to assist in the interactive process to identify a reasonable accommodation." [Doc. 35 at 15; Hunt Dep., Ex. 2]. The Court, however, notes that even according to Plaintiff, WellStar's policy places the burden on the employee to provide medical documentation in order to assist in the identification of a reasonable accommodation. But Plaintiff did not provide such documentation to Defendant even after Hunt asked Plaintiff in the June 5, 2018 correspondence to "explain how the requested accommodation(s) will allow you to perform in your position considering the health condition identified by your doctor." [Hunt Dep., Ex. 47].

Furthermore, in the June 5th correspondence, Hunt sought clarification about whether Plaintiff was "requesting all the stated modifications or whether [she] believe[d] that any of them individually will allow [her] to perform the essential functions of [her] position." [DSMF ¶ 90; Hunt Dep., Ex. 47]. Plaintiff now claims that she "did not expect WellStar to accommodate every request." [Doc. 35 at 15]. But in her June 5th email, Plaintiff did not respond to Hunt's request for clarification and offered no indication that only some of the requested accommodations would allow her to perform the essential functions of her position despite the fact that Hunt specifically asked Plaintiff about this issue. [Hunt Dep., Ex. 48]. A reasonable jury could not

review Plaintiff's emails from May 25 and June 5, 2018 and conclude that she was only requesting that some of the accommodations be made. Instead, each of Plaintiff's emails included an exhaustive laundry list of burdensome accommodations.

Plaintiff now alleges that she had no idea whether Hunt was referring to the upcoming work on the PCORI project or the Office Manager position when he asked for clarification about her needed accommodations. But Plaintiff did not indicate in her response that she was confused in any way about this issue. [Doc. 35 at 8-11]. Moreover, regardless of whether Plaintiff was referring to the PCORI project or the Office Manager position (or any other position with WellStar), the Court finds that Plaintiff's requested accommodations were patently unreasonable.

For example, in both her May 25th and June 5th emails to Hunt, Plaintiff requested "the implementation of flexible and supportive supervision style" including "POSITIVE reinforcement and feedback." [Hunt Dep., Exs. 45, 48 (emphasis in original)]. Even if this had been the only request made by Plaintiff, rather than merely one of more than a dozen, it would have been unreasonable. See Hargett v. Florida Atlantic Univ. Bd. of Trustees, 219 F. Supp. 3d 1227, 1243 (S.D. Fla. 2016) ("A demand for a supervisor to adopt a less overbearing management style is generally held to be unreasonable."). Plaintiff also requested "reduction and/or removal of distractions in the work area," "communication of assignments and instructions in my

preferred learning style," "written tools such as daily 'to-do' lists [and] step-by-step checklists," and "no behavior . . . of any kind that will exacerbate my mental health condition." [Hunt Dep., Exs. 45, 48]. In addition, Plaintiff requested the "development of strategies to deal with problems BEFORE they arise"; a requirement that all meetings be scheduled at least a week in advance, with the agenda and attendees to be disclosed when the meeting is scheduled; and a requirement that any cancellation, rescheduling, or postponing of meetings to be done in writing and with an explanation at least 24 hours in advance. Making matters worse, Plaintiff's requests were not based on any guidance from her health care providers but were cut and pasted from "the ADA website." [DSMF ¶ 94; Pla. Dep. at 145]. The Court finds that Plaintiff's numerous accommodation requests, most of which seek an entirely carefree workplace, do not come close to being reasonable. As the Eighth Circuit has explained, "We do not believe . . . that the obligation to make reasonable accommodation extends to providing an aggravation-free environment." Cannice v. Norwest Bank Iowa N.A., 189 F.3d 723, 728 (8th Cir. 1999).

As previously noted, a plaintiff is not a "qualified individual" under the ADA if her requested accommodations are not reasonable. See Everett, 703 F. App'x at 943; Spears, 607 F. App'x at 950. Because the accommodations requested by Plaintiff were unreasonable as a matter of law, Plaintiff has failed to carry her burden of showing that

she was a "qualified individual" under the ADA.  Summary judgment, therefore, is warranted on Plaintiff's ADA claim.

Even assuming *arguendo* that Plaintiff were able to show that she is a qualified individual under the ADA, the Court would recommend that Defendant's summary judgment motion be granted on Plaintiff's ADA claim because she cannot establish the final element necessary to establish a *prima facie* case.  As previously noted, the ADA requires Plaintiff to show that she was discriminated against because of her disability.  See Mazzeo, 746 F.3d at 1268.  A failure to make a reasonable accommodation to the limitations of an individual with a disability falls within the ADA's definition of discrimination.  See 42 U.S.C. § 12112(b)(5)(A).  A "reasonable accommodation" may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, . . . and other similar accommodations for individuals with disabilities."  42 U.S.C. § 12111(9)(b).  However, an employer is not required to provide an employee with "'the maximum accommodation or every conceivable accommodation possible.'"  Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1285 (11th Cir. 1997) (quoting Lewis v. Zilog, Inc., 908 F. Supp. 931, 947 (N.D. Ga. 1995)).

When Plaintiff returned from FMLA leave on February 23, 2018, she asked for a reduced schedule of four hours per day based on a recommendation by her doctor.

[PSMF ¶ 60; DSMF ¶ 51; Pla. Dep. at 90, 94].  The reduced schedule was to be for thirty days and her reduced hours were 8am to 12pm three days a week and 1pm to 5pm two days a week for inpatient treatment.  [PSMF ¶¶ 61, 62; Pla. Dep. at 94].  Defendant WellStar approved Plaintiff's requested accommodation at that time and she returned to work.  [DSMF ¶ 52; Pla. Dep. at 91].  Plaintiff's later accommodation requests, however, were not approved by Defendant.  In April 2018 and again in May 2018, Plaintiff refused to work with or even meet with Director of Patient Operations Adewale Adebayo and Assistant VP Amber Thomas-Hutson.  [Pla. Dep., Ex. 3; Hunt Dep., Exs. 42, 44].  Plaintiff later made numerous accommodation requests, discussed in detail *supra*, if she had to work with Adebayo and Thomas-Hutson.  [Hunt Dep., Exs. 45, 48].

"The burden of identifying an accommodation that would allow a qualified employee to perform the essential functions of her job rests with that employee, as does the ultimate burden of persuasion with respect to showing that such accommodation is reasonable." Earl v. Mervyns, Inc., 207 F.3d 1361, 1367 (11th Cir. 2000).  Thus, "[t]he plaintiff bears the burden of identifying a reasonable accommodation that would allow a qualified individual to perform the job, and an employer is not required to accommodate an employee in any manner in which the employee desires." Gilliard v. Georgia Dep't of Corrections, 500 F. App'x 860, 868 (11th Cir. 2012) (citing Stewart,

117 F.3d at 1285-86).  Given the evidence previously discussed regarding Plaintiff's numerous burdensome requests, the Court finds that Plaintiff has not carried her burden of showing that Defendant WellStar did not make a reasonable accommodation to her disability.  Because Plaintiff is unable to establish a *prima facie* case under the ADA, it is **RECOMMENDED** that Defendant's summary judgment motion [Doc. 31] be **GRANTED** on Plaintiff's ADA failure to accommodate/disability discrimination claim [Doc. 14, Count Four].

### D.      ADA Retaliation Claim

The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).  In Count Five of her Amended Complaint, Plaintiff Edwards asserts a claim for retaliation based on the ADA.  [Doc. 14 ¶¶ 69-76].  Plaintiff alleges that Defendant terminated her employment in violation of the ADA in retaliation for her actions in informing WellStar of her need for a reasonable accommodation.[6]  Plaintiff

---

[6] It appears from Plaintiff's response brief that she is now alleging that her ADA retaliation claim is based not only on her termination, but on other adverse employment actions.  [Doc. 35 at 22-23].  To the extent that Plaintiff seeks to amend her ADA retaliation claim through her response brief, this is not permitted.  See Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not

writes, "After informing WellStar of her need for reasonable accommodations to perform her job, she was terminated." [Id. ¶ 72].

The Court finds that Plaintiff's ADA retaliation claim is duplicative of her ADA failure to accommodate claim.  In both her ADA retaliation and failure to accommodate claims, Plaintiff asserts that Defendant WellStar refused to provide a reasonable accommodation to her disability and, instead, terminated her employment.   The Eleventh Circuit has consistently "refused to address a plaintiff's retaliation claims based on an employer's refusal to accommodate her where the described acts relate directly to her reasonable accommodation discrimination claim, not her retaliation claim." Gilliard, 500 F. App'x at 869 (citation and internal quotation marks omitted). The court's reasoning in Calvo v. Walgreens Corp., 340 F. App'x 618 (11th Cir. 2009) is applicable to the present case: "[T]he gist of [Plaintiff's] *discrimination* claim is that [Defendant] refused to accommodate her because of her disability.  [Defendant] did not refuse to accommodate [Plaintiff] because she requested accommodation." Id. at 626 (emphasis in original).  Plaintiff's ADA retaliation claim "merely reclothes" her ADA discrimination claim which could not survive summary judgment for the reasons

_____

amend her complaint through argument in a brief opposing summary judgment.") (citation omitted).  Because Plaintiff's Amended Complaint makes it clear that the only adverse action upon which her ADA retaliation claim is based is her June 2018 termination, this is the only adverse action properly before the Court.  [Doc. 14 ¶ 72].

discussed *supra*. Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1261 (11th Cir. 2001).

The Court, therefore, **RECOMMENDS** that Defendant's summary judgment motion

[Doc. 31] be **GRANTED** on Plaintiff's ADA retaliation claim [Doc. 14, Count Five].[7]

See Stewart, 117 F.3d at 1288 (finding that "the acts Stewart describes relate directly

to her 'reasonable accommodation' discrimination claim, not her retaliation claim, and

accordingly provide no basis for denying summary judgment on this issue"); Perez v.

Sprint/United Mgmt. Co., No. 1:12-CV-3161-MHS, 2013 WL 6970898, at *11 (N.D.

Ga. Dec. 19, 2013) (noting that "[t]he acts plaintiff describes in support of his

retaliation claim relate to his discrimination and reasonable accommodation claims, not

to any retaliation claim").

### E.    **FMLA Retaliation Claim**

In Count One of her Amended Complaint, Plaintiff Edwards asserts a claim for

FMLA retaliation.  [Doc. 14 ¶¶ 37-44].  Plaintiff alleges that Defendant "WellStar

---

[7] Retaliation claims brought pursuant to the ADA and the FMLA are evaluated under the same framework used for Title VII retaliation claims.  See Strickland v. Water Works and Sewer Bd. of City of Birmingham, 239 F.3d 1199, 1207 (11th Cir. 2001); Earl, 207 F.3d at 1367; Stewart, 117 F.3d at 1287.  As discussed *infra* with regard to Plaintiff's FMLA retaliatory termination claim, a reasonable jury could not find that Defendant's proffered reasons for terminating Plaintiff's employment were pretexts for retaliation.  Thus, even assuming *arguendo* that Plaintiff's ADA retaliation claim were not duplicative of her ADA failure to accommodate claim, summary judgment would be appropriate on the ADA retaliation claim for the same reasons that Plaintiff's FMLA retaliation claim cannot survive summary judgment.

retaliated against Ms. Edwards by transferring her to a different position and issuing her a [Performance Improvement Plan] upon her return from FMLA in February 2018 for a position that she had never even worked." [Id. ¶ 38]. Plaintiff also alleges that Defendant retaliated against her "when it terminated her employment knowing she had already been approved for FMLA intermittent leave through February 23, 2019 for her serious health condition." [Id. ¶ 40].

The FMLA makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). The Eleventh Circuit has held that courts should evaluate FMLA retaliation claims under the same framework used for Title VII retaliation claims. See Batson v. Salvation Army, 897 F.3d 1320, 1328-29 (11th Cir. 2018); Martin, 543 F.3d at 1268; Strickland, 239 F.3d at 1207; Earl, 207 F.3d at 1367. In the present case, because Plaintiff Edwards relies on circumstantial evidence, rather than direct evidence, to establish Defendant WellStar's retaliatory intent, application of the McDonnell Douglas framework is appropriate. See Batson, 897 F.3d at 1328-29 ("Where, as here, an employee alleges retaliation under the FMLA or the ADA without direct evidence of the employer's intent, we apply the burden shifting framework established in McDonnell Douglas[.]").

Under the McDonnell Douglas framework, the employee first has the burden of

54

establishing a *prima facie* case of retaliation.  See Batson, 897 F.3d at 1329.  To establish a *prima facie* case of retaliation under the FMLA, a plaintiff must show the same elements generally required for a claim of retaliation under Title VII: (1) that she engaged in statutorily protected expression, (2) that she suffered an adverse employment action, and (3) that there is a causal connection between the expression and the adverse employment action.  See id.; Strickland, 239 F.3d at 1207.  If the employee establishes a *prima facie* case of retaliation, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action taken against the employee.  See Hurlbert, 439 F.3d at 1297.  "If the employer does so, the burden shifts back to the employee to demonstrate that the employer's proffered reason was pretextual by presenting evidence sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision."  Batson, 897 F.3d at 1329 (citation and internal quotation marks omitted).

The first *prima facie* element requires Plaintiff to show that she engaged in protected expression as it is defined under the FMLA.  This element may be met by seeking FMLA leave.  See Strickland, 239 F.3d at 1207.  Plaintiff is able to satisfy this element.  Plaintiff notes that she requested and was granted FMLA leave by Defendant WellStar for 14 weeks from May 16, 2017 to August 21, 2017.  [Doc. 35 at 21; PSMF

¶ 17; DSMF ¶ 21].  Defendant also granted Plaintiff FMLA leave for more than 18 weeks from October 16, 2017 to February 23, 2018, and the company granted Plaintiff intermittent FMLA leave on February 23, 2018.  [Doc. 35 at 21; DSMF ¶¶ 47, 50; PSMF ¶¶ 55, 56, 67; Hunt Dep. at 114; Pla. Dep. at 84-85].  In addition, on March 1, 2018, Plaintiff complained about Director of Patient Operations Adewale Adebayo and Dr. Michael Christa questioning her need for FMLA leave.  [Pla. Dep. at 94-95, 102-04; PSMF ¶¶ 70, 71, 75; DSMF ¶¶ 54, 55].

Plaintiff is also able to establish the second *prima facie* element of her FMLA retaliation claim.  There is no dispute that the termination of Plaintiff's employment in June 2018 constitutes an adverse employment action.  [Doc. 14 ¶ 40].  Plaintiff also alleges that she was subjected to adverse actions when Defendant WellStar informed her that she would be transferred to a different position and when the company told her that she would be issued a Performance Improvement Plan ("PIP") in April 2018.[8] [Doc. 14 ¶ 38; Doc. 35 at 26-27].  The Supreme Court has held that a plaintiff bringing a retaliation claim "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have

---

[8] Plaintiff asserts in her Complaint that the transfer and PIP occurred in February 2018.  [Doc. 14 ¶ 38].  However, in her response brief, Plaintiff states that the transfer and PIP occurred on April 9, 2018.  [Doc. 35 at 26-27].

dissuaded a reasonable worker from making or supporting a charge of discrimination."
Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (citations
and internal quotation marks omitted).  For summary judgment purposes, the Court
finds that the April 2018 transfer, the April 2018 PIP, and the June 2018 termination
satisfy the adverse employment action *prima facie* element. [9]  [Doc. 14 ¶¶ 38, 40].

The third and final element of a *prima facie* case of retaliation under the FMLA
requires Plaintiff to show that there is a causal connection between the protected
expression and the adverse employment actions.  The Eleventh Circuit has not yet
addressed the issue, but it appears that "but-for" causation is necessary to establish a
causal connection given the fact that the court "has analyzed FMLA retaliation
congruently with Title VII retaliation borrowing applicable case law." Jones v. Allstate
Ins. Co., 281 F. Supp. 3d 1211, 1219 (N.D. Ala. 2016), aff'd, 707 F. App'x 641 (11th
Cir. 2017) (citing Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 798 (11th
Cir. 2000)).  Under Title VII, if an employer takes an adverse employment action
against an employee shortly after becoming aware of the employee's protected

---

[9] Plaintiff alleges in her response brief that her retaliation claim is also based on a number of other adverse employment actions which are not alleged in her Amended Complaint.  [Doc. 35 at 22-23].  But as noted *supra*, Plaintiff is not permitted to amend her claims through a response brief.  See Gilmour, 382 F.3d at 1315.  The only adverse employment actions properly before the court that form the basis of Plaintiff's FMLA retaliation claim are the termination, transfer, and PIP.

expression, then the close temporal proximity between the two events is sufficient to meet the "but-for" causation requirement. See Adams v. City of Montgomery, 569 F. App'x 769, 773 (11th Cir. 2014); accord Brungart, 231 F.3d at 799.

The Eleventh Circuit has held "that temporal proximity, for the purpose of establishing the causation prong of a prima facie case of FMLA retaliation, should be measured from the last day of an employee's FMLA leave until the adverse employment action at issue occurs." Jones, 854 F.3d at 1272. In the present case, Plaintiff returned from more than 18 weeks of FMLA leave on February 23, 2018. [Doc. 35 at 21; DSMF ¶¶ 47, 50; PSMF ¶¶ 55, 56, 67; Hunt Dep. at 114; Pla. Dep. at 84-85]. On March 1, 2018, Plaintiff complained about Director of Patient Operations Adebayo and Dr. Christa questioning her need for FMLA leave. [Pla. Dep. at 94-95, 102-04; PSMF ¶¶ 70, 71, 75; DSMF ¶¶ 54, 55]. March 1, 2018, was the last day that Plaintiff actually worked at WellStar because the next day, Assistant HR VP Joey Hunt placed Plaintiff on administrative leave. [PSMF ¶¶ 77, 78, 82; DSMF ¶ 99]. On April 9, 2018, Hunt met with Plaintiff and informed her that she would be transferred from her position at the Powder Springs location to the PCORI project and that she would be placed on an amended PIP. [Pla. Dep. at 107-08; PSMF ¶ 84; DSMF ¶ 58; Hunt Dep., Ex. 40]. Plaintiff was terminated from her employment with WellStar two months later on June 8, 2018. [Hunt Dep., Ex. 49]. Although the issue is a close one,

the Court finds for summary judgment purposes that given the temporal proximity between Plaintiff's last day of FMLA leave, her complaints about Adebayo and Christa, her being placed on administrative leave, the transfer, PIP, and termination, Plaintiff has offered sufficient evidence to establish a causal connection in support of her FMLA retaliation claim.[10]

As noted *supra*, under the McDonnell Douglas framework, once the employee establishes a *prima facie* case of retaliation, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. See Batson, 897 F.3d at 1329; Hurlbert, 439 F.3d at 1297. The "defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." Kragor v. Takeda Pharm. Am., Inc., 702 F.3d 1304, 1308 (11th Cir. 2012) (citation and internal quotation marks omitted). "[T]he employer's burden is 'exceedingly light.'" Meeks v. Computer Assocs. Int'l, 15 F.3d 1013, 1021 (11th Cir. 1994) (citation omitted). If the employer carries its burden of

---

[10] However, as discussed *infra*, Plaintiff's PIP was prepared in October 2017, long before her February 2018 return from FMLA leave. The Court will assume that Plaintiff is able to establish a *prima facie* case of FMLA retaliation with respect to the PIP, but it is questionable whether a reasonable jury could find a causal connection in light of the fact that Plaintiff's "protected expression on her part occurred only after the commencement of the adverse employment actions of which she complains." Pipkins v. City of Temple Terrace, Florida, 267 F.3d 1197, 1201 (11th Cir. 2001).

production, the employee then must demonstrate that the employer's proffered reasons were mere pretexts for retaliation.  See Batson, 897 F.3d at 1329.  Plaintiff "'may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'"  Jackson v. State of Alabama State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005) (quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981)).  In order to establish pretext through the indirect method, the plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."  McCann v. Tillman, 526 F.3d 1370, 1375-76 (11th Cir. 2008) (citations and internal quotation marks omitted).  "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason."  Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000) (citations omitted).  The Court finds that Defendant has presented legitimate, nondiscriminatory reasons for the complained-of actions and that Plaintiff has not cited to evidence which would permit a reasonable jury to find that the proffered reasons are pretextual.

Defendant WellStar asserts that in April 2018, it issued Plaintiff the PIP because

of numerous job performance problems and because of allegations that in September 2017, Plaintiff had confronted employees seeking information about what was said during a trust survey meeting. [Doc. 31-1 at 8; DSMF ¶ 40; Pla. Dep. at 70]. The PIP, which was dated October 6, 2017, noted that it was created to address "ongoing issues discussed with [Plaintiff] in FY17 and FY18." [DSMF ¶ 45; Hunt Dec., Ex. 4]. The PIP stated that Plaintiff had exhibited a "lack of professional behavior" which had negatively impacted "team member engagement and team member perception of a safe, non-hostile work environment." [Id.]. The PIP also stated that Plaintiff had engaged "in discussion about Trust Action Planning Focus sessions where names and comments of specific team members were revealed to manager leading to mass anxiety and fear of retaliation by manager toward team members." [Id.]. In addition, the PIP stated that Plaintiff had deficiencies in communication, working relationships, working collaboratively with physicians, and her ability to receive constructive feedback, all of which allegedly violated WellStar's Code of Conduct. [Id.].

Plaintiff's FMLA retaliation claim is based on her assertion that Defendant gave her the PIP in retaliation for her March 2018 protected expression, but the PIP was issued five months earlier on October 6, 2017. Nevertheless, Plaintiff contends that retaliatory animus is revealed by the fact that the October 2017 PIP was not presented to her when she returned from FMLA leave in February 2018. Instead, Plaintiff notes

that Defendant only presented the PIP to her in April 2018 after she complained about her supervisors questioning her need for ADA accommodations and intermittent FMLA leave. [Doc. 35 at 26]. To the extent that Plaintiff argues that these facts establish pretext, the argument fails.[11]

The record reveals that Plaintiff was at work for less than a week on a reduced schedule beginning in February 23, 2018, after she had been on FMLA leave for more than four months. [PSMF ¶ 60; DSMF ¶¶ 51, 52; Pla. Dep. at 90, 94]. On March 1, 2018, Plaintiff complained about Director of Patient Operations Adewale Adebayo and Dr. Michael Christa and stated that she did not feel safe at the Powder Springs Medical Center since Dr. Christa did not trust her and since he was questioning her need for FMLA leave, which made Plaintiff fearful of losing her job. [PSMF ¶¶ 70, 74, 75; DSMF ¶¶ 54, 55; Pla. Dep. at 102-04]. On March 2, 2018, Hunt placed Plaintiff on administrative leave after she stated that she felt unsafe. [PSMF ¶¶ 77, 78; DSMF ¶ 99]. The fact that Plaintiff was not given the October 2017 PIP during the one week that she was at work during the end of February 2018 does not create an inference of pretext.

Moreover, although Defendant has offered a number of reasons for issuing

---

[11] Because Plaintiff does not make these arguments in the pretext portion of her brief, it is unclear if she is asserting that the cited facts support a finding of pretext. [Doc. 35 at 27-30].

Plaintiff the PIP, Plaintiff has not met those reasons head on and rebutted them.  [Doc. 35 at 24-30].  As noted *supra*, the PIP stated that decisionmakers at WellStar believed that Plaintiff had exhibited a "lack of professional behavior," that she had engaged in inappropriate discussions about the "Trust Action Planning Focus sessions," and that she had a number of job performance deficiencies.  [DSMF ¶ 45; Hunt Dec., Ex. 4].  At the pretext stage, the "question is whether [Plaintiff's] employers were dissatisfied with her for these or other non-discriminatory reasons, even if mistakenly or unfairly so[.]"  Alvarez v. Royal Atlantic Developers, Inc., 610 F.3d 1253, 1266 (11th Cir. 2010) (citation omitted).  Plaintiff has not offered evidence which would permit a reasonable factfinder to conclude that Hunt, Assistant VP Amber Thomas-Hutson, or any other decisionmaker involved in issuing the PIP did not actually believe that Plaintiff's actions and job performance warranted a PIP.  While Plaintiff may believe that she did not deserve the PIP, her belief is not relevant to the pretext inquiry.  "The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head."  Id. (citation omitted).  The Eleventh Circuit has also stressed that courts "'must be careful not to allow Title VII plaintiffs simply to litigate whether they are, in fact, good employees.'"  Id. (quoting Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2002)).  A reasonable jury could not find that Defendant's proffered reasons for issuing Plaintiff

the PIP were pretexts for FMLA retaliation.

With regard to the transfer, Assistant HR VP Hunt and Thomas-Hutson testified that Plaintiff was going to be transferred due to employee concerns about Plaintiff at the Powder Springs location and in order to give Plaintiff a fresh start at another practice.  [Hunt Dec. ¶ 13; Thomas-Huston ¶¶ 8, 9].  During a meeting on April 9, 2018, Hunt told Plaintiff that she would be removed from the Powder Springs location and that WellStar was going to have her work on the PCORI project.  In addition, Hunt told Plaintiff that she would eventually transfer to the Douglasville location, which would open in July or August of 2018, to be in the same position of Office Manager with the same salary and benefits.  [PSMF ¶ 84; DSMF ¶ 60; Hunt Dep., Ex. 42].  Plaintiff argues Defendant's proffered reasons are pretextual.  In support of her argument, Plaintiff writes, "As to the PCORI project, WellStar's retaliatory animus is demonstrated by the fact that Hunt would not tell Ms. Edwards what her essential functions would be on the project."  [Doc. 35 at 28].  This argument is unpersuasive.

As noted *supra*, Hunt informed Plaintiff that she would be working on the PCORI project on an interim basis and that she would have a meeting with Hunt, Thomas-Hutson, and Adebayo to "discuss this transition."  [Pla. Dep., Ex. 3].  However, Plaintiff responded by writing, "[D]ue to my current health condition, I cannot meet with Mr. Adebayo or Ms. Hutson."  [Id.].  As a result of Plaintiff's refusal

to have a meeting to discuss the PCORI project, she remained uninformed about the job functions of the project. Despite Plaintiff's argument to the contrary, a reasonable jury could not find that these facts reveal that WellStar decisionmakers wanted to transfer her to the PCORI project because of retaliatory animus.

Furthermore, Plaintiff complained to Hunt in early March 2018 that she did not feel safe at the Powder Springs location because she was being harassed by Dr. Michael Christa, the lead physician at the Powder Springs Medical Center. [PSMF ¶¶ 7, 70-72, 74, 77-79; DSMF ¶¶ 54, 56]. Defendant responded by informing Plaintiff that she was being transferred to the PCORI project on an interim basis and then to the Douglasville location, which would open in July or August of 2018, where she would resume her job as an Office Manager. [PSMF ¶ 84; Hunt Dep., Ex. 42]. A reasonable factfinder could not conclude that Defendant's actions in transferring Plaintiff away from Dr. Christa at the Powder Springs location to a new location where she would hold the same job was an act of retaliation when Plaintiff was the one who complained about Dr. Christa. These facts simply do not support Plaintiff's pretext argument.

With regard to Plaintiff's termination, Defendant WellStar contends that it terminated Plaintiff's employment because she was unable to perform the essential functions of the position and because she could not identify a reasonable accommodation that would allow her to do so. [Doc. 31-1 at 11-12]. The Court finds

that Plaintiff has failed to show that Defendant's proffered reasons were pretexts for FMLA retaliation.  As discussed in detail *supra*, on May 25, 2018, Hunt informed Plaintiff that she would not be transferred to a different manager but Hunt also wrote, "If there is a different accommodation you would like to request or any other information you would like to provide regarding your ability to work in your position, please let me know by June 1, 2018."  [PSMF ¶ 122; DSMF ¶ 88; Hunt Dep., Ex. 46]. Later that same day, Plaintiff responded by email, stating, "[D]ue to my mental health condition (please refer to physician statement) the following reasonable accommodations have been determined 'a reasonable accommodation' under the [ADA]."  [Hunt Dep., Ex. 45]  Plaintiff then listed more than a dozen accommodations that she was requesting, including: telecommuting and/or working from home on an as-needed basis; reduction and/or removal of distractions; tape recorders for recording/reviewing meetings and training; additional assistance and/or time for orientation activities, training, and learning job tasks and new responsibilities; implementation of flexible and supportive supervision style; positive reinforcement and feedback; development of strategies to deal with problems before they arise; requiring all meetings to be scheduled at least a week in advance, with the agenda and attendees to be disclosed when the meeting is scheduled; and requiring any cancellation, rescheduling, or postponing of meetings to be done so in writing and with

an explanation at least 24 hours in advance.  [DSMF ¶ 89; Hunt Dep., Ex. 45].

On June 5, 2018, Hunt responded to Plaintiff via email and letter seeking clarification about whether she was "requesting all the stated modifications or whether [she] believe[d] that any of them individually will allow [her] to perform the essential functions of [her] position."  [DSMF ¶ 90; Hunt Dep., Ex. 47].  Hunt also asked Plaintiff for specific information about the nature of her requested accommodations. [Id.].  Although Plaintiff now asserts that she "did not intend for WellStar to accommodate every request," she did not say that in her response to Hunt's message, despite the fact that Hunt specifically asked Plaintiff about this issue.  [Doc. 35 at 28]. Instead, Plaintiff responded to Hunt on June 5, 2018, by again requesting more than a dozen "cost effective reasonable accommodations," many of them identical to those listed in the prior message to Hunt, including: adjustments in the start or end of work hours on an as-needed basis; due to health conditions and/or medication side effects; flexibility in scheduling breaks; reduction and/or removal of distractions; tape recorders for recording/reviewing meetings and training sessions; additional assistance and/or time for orientation or re-acclimation; additional training or modified training materials; implementation of flexible and supportive supervision style; positive reinforcement and feedback; additional forms of communications and/or written and visual tools; regularly scheduled meetings (weekly) to discuss workplace issues and

productivity; development of strategies to deal with problems before they arise; requiring all meetings to be scheduled at least a week in advance, with the agenda and attendees to be disclosed when the meeting is scheduled; and requiring any cancellation, rescheduling, or postponing of meetings to be done so in writing and with an explanation at least 24 hours in advance. [DSMF ¶ 92; Hunt Dep., Ex. 48]. Plaintiff testified that the numerous accommodation requests were not based on any guidance from her health care providers but were cut and pasted from "the ADA website." [DSMF ¶ 94; Pla. Dep. at 145].

Hunt responded to Plaintiff's email stating that he had reviewed Plaintiff's requested accommodations in her June 5th email. [Hunt Dep., Ex. 49]. Hunt informed Plaintiff that he was unable to grant her requests because "some of the requested accommodations make it impractical for the department to operate – i.e., scheduling all meetings a week in advance and providing an agenda and attendee list for all meetings" and because "many of the requested accommodations are too general to implement in any meaningful way – i.e., development of strategies to deal with problems before they arise." [Id.]. Hunt also stated, "At this point, we have provided you with multiple opportunities to identify a reasonable accommodation that would allow you to perform the essential functions of your position. You have not done so." [Id.]. Hunt then informed Plaintiff that her employment was terminated. [Id.]. Hunt

68

was the sole decisionmaker for Plaintiff's termination on June 8, 2018.  [PSMF ¶ 151].

As noted *supra*, Defendant WellStar stated that Plaintiff was terminated because she

could not identify a reasonable accommodation that would allow her to perform her

job.  A reasonable jury could not examine the evidence and conclude that WellStar's

proffered reasons for terminating Plaintiff's employment were pretextual.

The relevant evidence simply does not support a finding that Defendant was

motivated by a desire to retaliate against Plaintiff because she requested FMLA leave.

In fact, the record reveals that Defendant repeatedly granted Plaintiff's numerous

requests for FMLA leave.  Plaintiff was on FMLA leave from May 2017 to August 21,

2017, and she was on paid administrative leave from September 14 to October 14,

2017.  [PSMF ¶¶ 23, 34].  Plaintiff went back on FMLA leave on Monday, October 16,

2017 and remained on FMLA leave until February 23, 2018.  [DSMF ¶¶ 47, 50; PSMF

¶¶ 55, 56; Hunt Dep. at 114; Pla. Dep. at 84-85].  When Plaintiff returned from her

FMLA leave on February 23, 2018, she requested intermittent FMLA leave from

February 22, 2018 to February 23, 2019, which was approved on April 11, 2018.

[PSMF ¶ 67].  In addition, upon Plaintiff's return to work on February 23, 2018, she

asked for a reduced schedule of four hours per day based on a recommendation by her

doctor, and WellStar approved Plaintiff's requested accommodation.  [PSMF ¶¶ 60,

62; DSMF ¶¶ 51, 52; Pla. Dep. at 90-91, 94].

In sum, the record evidence would not permit a reasonable factfinder to conclude that Defendant's proffered reasons for the PIP, the transfer, and the termination were pretexts for FMLA retaliation.  It is, therefore, **RECOMMENDED** that Defendant's summary judgment motion [Doc. 31] be **GRANTED** on Plaintiff's retaliation claim brought pursuant to the FMLA [Doc. 14, Count One].

## IV.  <u>CONCLUSION</u>

Based on the foregoing reasons and cited authority, the Court **RECOMMENDS** that Defendant WellStar's Motion for Summary Judgment [Doc. 31] be **GRANTED** and that Plaintiff Edwards' claims [Doc. 14] be **DISMISSED WITH PREJUDICE**.

As this is a Final Report and Recommendation and there are no other matters pending before this Court, the Clerk is directed to terminate the reference to the undersigned.

**SO REPORTED AND RECOMMENDED**, this   15   day of May, 2020.

_Linda T. Walker_
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE